Case 17-1625

# In The
# United States Court of Appeals
## For The Fourth Circuit

UNITED STATES OF AMERICA,
*Plaintiff – Appellee*,
v.
ANCIENT COIN COLLECTORS GUILD,
*Claimant – Appellant.*

v.

3 KNIFE-SHAPED COINS, ET AL.,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

———————————

**BRIEF OF AMICI CURIAE
PROFESSIONAL NUMISMATISTS GUILD, INC., AMERICAN
NUMISMATIC ASSOCIATION, AND INTERNATIONAL ASSOCIATION
OF PROFESSIONAL NUMISMATISTS
IN SUPPORT OF APPELLANT ANCIENT COIN COLLECTORS GUILD
AND REVERSAL OF DISTRICT COURT ORDER OF DISMISSAL**

———————————

Armen R. Vartian
LAW OFFICES OF ARMEN R. VARTIAN
1601 N. Sepulveda Blvd. #581
Manhattan Beach, CA 90266
(310) 372-1355
armen@vartianlaw.com
*Counsel for Amici PNG, ANA and IAPN*

## Rule 26.1 Corporate Disclosure Statement

Pursuant to Fed. R. App. P. 26.1 and Fourth Cir. Rule 26.1, amici curiae Professional Numismatists Guild, Inc. ("PNG"), American Numismatic Association ("ANA") and International Association of Professional Numismatists ("IAPN") submit this corporate disclosure statement.

(a) Amici are organized as non-profit corporations and are not publicly-held corporations or entities.

(b) Neither of amici has a parent company and no publicly-held company has a 10% or greater ownership in either of amici.

(c) No publicly held company has a direct financial interest in the outcome of this litigation.

(d) No other publicly held legal entity has a direct financial interest in the outcome of this litigation.

(e) Amici ANA and IAPN have corporate members, but no member's stock or equity value will be affected by the outcome of this proceeding, and amici are not pursuing any corporate member's interest.

## Rule 29(c)(5) Statement of Independence from Parties

(A) No party's counsel authored this brief in whole or in part;
(B) No party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and
(C) No person — other than PNG, ANA, IAPN, their members, or their counsel — contributed money that was intended to fund preparing or submitting the brief.

# TABLE OF CONTENTS

**Page**

RULE 26.1 AND 29 DISCLOSURE STATEMENTS ..........................................i

TABLE OF CONTENTS...................................................................................ii

TABLE OF AUTHORITIES...........................................................................iii

AMICI'S INTEREST IN THESE PROCEEDINGS...........................................1

ARGUMENT.....................................................................................................4

I.    Prior Proceedings in this Case are Not Dispositive of the Issues Relating to Forfeiture…………………………………………………..4

II.    The "Find Spot" Requirement" Severely Limits the CPIA's Scope and Cannot be Written Out of the Statute .............................................5

III.    Congress Intended that the CPIA Protect the Rights of Dealers and Collectors Who Buy Unprovenanced Items such as Coins...........9

    a.  U.S. Official Reservations to the UNESCO Convention................9

    b.  The "Find Spot" Requirement Was A Compromise Meant to Protect Parties Such as Amici's Members....................................11

    c.  Congress's Most Recent Enactment Relating to Syrian Artifacts Puts the Burden of Proof on the Government, Not the Importer……………………………………………………13

IV.    The Court should Reverse or Remand for Proper Application of the Burdens of Proof Regarding the "Find Spot" Requirement ...........13

CONCLUSION................................................................................................17

CERTIFICATE OF COMPLIANCE..............................................................1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ancient Coin Collectors Guild v. U.S. Customs and Border Protection,*
698 F.3d 171 (4th Cir. 2012)……………………………...………… *passim*

*Ancient Coin Collectors Guild v. U.S. Customs and Border Protection,*
801 F.Supp.2d 383 (D. Md. 2011)……………………………..…5, 14

*Connecticut Nat. Bank v. Germain,*
503 U.S. 249, 253 (1992)………………………………………...……..8

Order of March 31, 2017,
Joint Appendix at 1391………………………………………...…….6

*Powerex Corp. v. Reliant Energy Services, Inc.,*
551 U.S. 224, 232 (2007)…………………………………….…...7

*United States v. An Original Manuscript Dated November 19, 1778,*
No. 96 civ. 6221 (LAP), (S.D.N.Y. Feb. 22, 1999)……………………...14

**STATUTES**

19 U.S.C. §2601 *et seq*…………………………………….…………*passim*

19 U.S.C. §2601(2)(C)…………………………………….......…….4, 5

19 U.S.C. §2601(2)(C)(i)(II)……………………………………….....10

19 U.S.C. §2601(2)(C)(i)(III)……………………………………….6

19 U.S.C. §2604………………………………………………......15

19 U.S.C. §2606……………………………………….…..5, 8

19 U.S.C. §2610……………………………………………….14

19 U.S.C. §2610(1)……………….…………………………………………14

Protect and Preserve International Cultural Property Act,
Pub. L. No. 114-151, 130 Stat. 369……………………….………....……………13

## INTERNATIONAL LAW

The Convention on the Means of Prohibiting and Preventing the
Illicit Import, Export and Transfer of Ownership of Cultural Property,
Nov. 14, 1970, 823 U.N.T.S. 231 (1972)…………………………………..…9, 10

## OTHER AUTHORITIES

Barbara T. Hoffmann, Art and Cultural Heritage: Law, Policy and
Practice, 160 (2006)…………………………………………………………11

"Cultural Property Treaty Legislation," Hearing before the House
Subcommittee on Trade of the Committee on Ways and Means,
96th Cong., 1st session on HR 3403 (1979)...............……………………….…12

S. Rep. 97-564, 1982 WL 25142...……………………………….……...…7, 11-13

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT


Case No. 17-1625

-------------------------------------------------x
ANCIENT COIN COLLECTORS GUILD,   :
               Plaintiffs,   :
                         :
v.   :
                         :
UNITED STATES CUSTOMS AND   :
BORDER PROTECTION et al.,   :
                         :
             Defendants.   :
-------------------------------------------------x

**BRIEF OF AMICI CURIAE PROFESSIONAL NUMISMATISTS GUILD,
INC., AMERICAN NUMISMATIC ASSOCIATION, INTERNATIONAL
ASSOCIATION OF PROFESSIONAL NUMISMATISTS**


*Amici curiae* Professional Numismatists Guild ("PNG"), American

Numismatic Association ("ANA") and International Association of Professional

Numismatists ("IAPN") respectfully submit this brief to the Court in support of

reversal or remand of the District Court's decision. **All parties have consented to

this filing under FRAP 29(a)(2)**.

### Amici's Interest in these Proceedings

Amici are the leading associations of rare coin dealers, auction houses and

collectors in the world. PNG is a 501(c)(6) trade association of over 300 coin and

1

currency dealers, headquartered in Temecula, CA. ANA is a federally-chartered 501(c)(3) educational organization dedicated to coin collectors, headquartered in Colorado Springs, CO. IAPN is an association of over 110 coin and currency dealers existing under the laws of Switzerland, with registered office in Zurich, Switzerland.

Americans have collected and traded in coins for a long time, and coin dealers and collectors in particular have enjoyed the rights accorded to most other citizens to import their lawfully-purchased items into the U.S. irrespective of the opinions of other countries as to whether those items are "cultural property". Congress, when enacting the Convention on Cultural Property Implementation Act ("CPIA"), expressed its intent to protect the rights of Americans who buy and sell items such as coins, by limiting the U.S. Government's role to that of assisting in the repatriation of items provably taken unlawfully from the countries requesting their return. For many years, *Amici's* members have imported coins purchased abroad without unnecessary hindrance or delay, it being well understood that coins in international trade are rarely the types of "plunder" that the CPIA was meant to deter.

The District Court decision changes the rules, endorsing a radical departure from Congress's intended CPIA framework. Under the District Court's interpretation of the CPIA, which in turn cited *dicta* from this Court in its earlier

ruling, *ACCG v. CBP*, 698 F.3d 171 (4th Cir. 2012), coins from China or Cyprus will be forfeited without a trial on the merits unless the importer can prove two negatives: (1) that the coins were *not* originally "found" in one of those countries; and/or (2) that the coins were *not* exported unlawfully from China or Cyprus after the effective dates of the import restrictions.

Coins epitomize items that leave their places of origin without documents recording their travels, and *ancient* coins are even less likely to come with proofs of their "find spots" and export histories. The U.S. Government itself recognized this, and during debates on CPIA Congress heard from the State Department's Deputy Legal Adviser that coins weren't being considered as part of the CPIA regime. *Amici*'s members relaxed, believing that CPIA would have little to no impact on their activities. But should the District Court's interpretation of CPIA stand, nearly every coin claimed by a foreign country under the Convention could be forfeited upon entry to the U.S. in summary proceedings, without a trial on the merits. *Amici's* members would no longer be able to rely on the express language and intent of the CPIA, and would be faced with ever-changing rules promulgated at the whims of foreign governments, without an opportunity to test whether the foreign government has properly established its right to enlist the U.S. courts in taking property from law-abiding Americans. *Amici*, therefore, are supporting reversal of the district court and proper adherence to the CPIA on remand.

**I – Prior Proceedings in this Case are Not Dispositive of Issues Relating to Forfeiture of the Coins**

*Amici* filed briefs supporting Appellants' prior (2012) appeal to this Court, which involved the propriety of the Government's imposition of import restrictions on the coins at issue. *Amicus* PNG's focus back then was on CPIA's "find spot" requirement, which symbolized Congress's careful – and unsentimental – balancing of international pressures to repatriate self-declared "cultural property" with the rights of Americans lawfully importing artworks and collectible items from abroad. CPIA prohibits repatriation of an item at the request of a "State Party" to the UNESCO Convention unless the item is "[an] object of archaeological or ethnological material . . . which was first discovered within, and is subject to export control by, the State Party." 19 U.S.C. §2601(2)(C). This Court eventually upheld the Government's restrictions on these coins. In its 2012 decision, the Court touched on the "find spot" requirement briefly, in rejecting the argument of Appellants (and *amici*) that allowing seizure of coins without any evidence that they were "discovered within" and "subject to export control of" Cyprus and China "effectively read the 'first discovered' requirement out of the statute." *ACCG v. CBP, supra*, 698 F.3d at 182.

At that stage in the proceedings, this Court was considering only the propriety of CBP's seizure of the coins at the border, and of the Memoranda of Understanding between the U.S., Cyprus and China that underpinned it. As the

4

case has now evolved into one of forfeiture, and the property rights of Appellants are more immediately implicated, this Court may, and should, revisit this point. *Amici* will again make it their focus.

## II – The 'Find Spot" Requirement Severely Limits the CPIA's Scope and Cannot be Written Out of the Statute.

Among the CPIA's many requirements is that a covered object be "[an] object of archaeological or ethnological material . . . which was first discovered within, and is subject to export control by, the State Party." 19 U.S.C. §2601(2)(C). In its 2011 Opinion, the District Court presumed that *all* coins on either the China or Cyprus list were "first discovered within" China or Cyprus, respectively, and were subject to seizure under the CPIA unless the importer proved that either: 1) the coins left China or Cyprus prior to imposition of the import restrictions; or 2) the importer had permission to take the objects out of China or Cyprus after restrictions were imposed, thereby satisfying 19 U.S.C. §2606, which permits importers to prove through documentary evidence that the goods in question were exported legally. *ACCG v. CBP,* 801 F.Supp.2d 383, 405-06 (D. Md. 2011).  This Court, in dicta, endorsed this interpretation, concluding that all coins on the "designated" lists with China and Cyprus were "first discovered" in those countries:

> CPAC and the Assistant Secretary did consider where the restricted types [of coins] may generally be found as part of the review of the Chinese and Cypriot requests.  CBP listed the articles in question in

5

the federal Register by 'type' – but only after State and CPAC had determined that each type was part of the respective cultural patrimonies of China and Cyprus….Among the members of CPAC are three 'experts in the fields of archeology, anthropology, ethnology, or related areas' and three 'experts in the international sale of archeological, ethnological, and other cultural property." Plaintiffs have given us no reason to question CPAC's conclusion, as adopted by State, as to where the types of cultural property at issue were discovered. To the contrary, it was hardly illogical for CPAC to conclude that, absent evidence suggesting otherwise, Chinese and Cypriot coins were first discovered in those two countries and form part of each nation's cultural heritage.

*ACCG v. CBP, supra*, 698 F.3d at 182. On the basis of the above dicta, the District Court ruled against Appellant's "first discovery" argument in its March 31, 2017 order, saying "The Fourth Circuit opinion forecloses this line of argument." Order of March 31, 2017 at JA1391.

But this interpretation of §2601 is flawed for a number of reasons. First, equating "first discovered" with "originally manufactured" imposes a definition of "discovered" at odds with Congress' other use of that same word in the very same section of the CPIA, namely in requiring that an "object of archaeological interest [must have been] normally *discovered* as a result of scientific excavation, clandestine or accidental digging, or exploration on land or underwater." 19 U.S.C. §2601(2)(C)(i)(III) (emphasis added). It would be absurd to read §2601(2)(C)(i)(III) to say: "normally *manufactured* as a result of scientific excavation..." Congress should not be presumed to have meant two different things

6

with the same word in the same section of one statute. "A standard principle of statutory construction provides that identical words and phrases within the same statute should be given the same meaning." *Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 232 (2007). Clearly, Congress intended "discovered" to refer to where an object – such as a coin – is found in modern times, not where it was originally manufactured.[1] Therefore, there can be no presumption that a coin that was originally manufactured in Cyprus or China was "discovered" there for CPIA purposes.

Second, that interpretation ignores the words "subject to export control by," which demonstrate beyond any doubt that Congress meant to include only coins discovered within the requesting foreign country – and in modern times[2] -- because by definition only such coins could be subject to that country's export controls. For example, if Cypriot coins are unearthed in a field in Greece, the CPIA cannot restrict importation of such coins into the U.S. because Cyprus had no right to

---

[1] *See* S. Rep. 97-564, 23, 1982 WL 25142, "'Archaeological material' includes any object . . . which normally has been discovered through scientific excavation, clandestine or accidental digging, or exploration on land or under water. Archaeological objects are usually found underground or under water, or are discovered through excavation, digging, or exploration."

[2] This Court noted in its 2012 decision that Appellants "need not have documented every movement of its coins since ancient times". CPIA's "subject to export control by" indicates that only modern times are involved. Besides, any argument that the CPIA covers coins which left their country of origin decades or centuries ago, i.e., whose most recent "discovery" did not take place in those original countries, would also have to face Congress' clear statement in ratifying the Convention that the U.S. would recognize only removals which took place after the Convention's entry into force. See Part IIIa, *infra*.

7

restrict the exportation of the coins from Greece. The fact that those coins might have been on CPAC's "designated" list is irrelevant. Assuming that Congress "says in statute what it means and means in statute what it says there," *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992), the expansive definitions of "first discovered" and "subject to export control by" are contrary to the CPIA's plain meaning.

Third, the District Court – and this Court in its 2012 dicta – interpreted §2601 as placing the burden on coin importers to prove that their coins should be *excluded* from the CPIA by analogy to the §2606 "legal export" exception, rather than requiring the requesting country to prove that the coins are *included* in the first place. But §2601 defines the scope of the CPIA itself, consistent with the general purposes articulated by Congress, and §2606 is irrelevant to that determination. It makes perfect sense under §2606 to require importers to come forward with evidence if the requesting country has already established that a coin (a) was discovered there; (b) was subject to that country's export control; and (c) was unlawfully exported. If the requesting country were not required to make at least a *prima facie* case with respect to those three facts, there would have been no need for Congress to provide the §2606 "exception".

Had Congress omitted the "first discovery" and "subject to export control" requirements, the CPIA would define archaeological material subject to forfeiture

8

and repatriation as "any object of archaeological interest . . . to the State Party."
And this is precisely how the District Court believed this provision should be read,
by limiting the Government's burden simply to establishing that a coin was
"designated" in the China or Cyprus coin lists.  Such an interpretation of §2601's
"find spot" requirement does, indeed, write the "find spot" requirement out of the
statute altogether. There is no legal basis for doing so.

**III – Congress Intended that the CPIA Protect the Rights of Dealers and Collectors Who Buy Unprovenanced Items such as Coins.**

Congress has a long and clear history of reluctance to permit the CPIA to
impose unnecessary restrictions on the trade of transient archaeological objects.

### a.  U.S. Official Reservations to the UNESCO Convention

The U.S. ratified the Convention, but with specific restrictions. The U.S. did
not consider the treaty self-executing as did other countries, and attached both a
reservation and multiple "understandings" to its ratification.[3] For example,
Congress reserved the right to define which objects would be considered cultural
property under U.S. law, rather than adopting the Convention's definition. With
respect to coins in particular, while the Convention includes any coin "more than

---

[3] The Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, Nov. 14, 1970, 823 U.N.T.S. 231 (1972) [Hereinafter 1970 Convention].

9

one hundred years old,"[4] the CPIA requires archeological objects such as coins to be be more than 250 years old.

Nowhere is the U.S. attitude toward the Convention more clear – and more relevant to this case – than with respect to Article 13(d), by which each ratifying country agrees to allow fellow countries to "classify and declare certain cultural property as inalienable which should therefore ipso facto not be exported, and to facilitate recovery of such property . . . where it has been exported."  The U.S. applied two "understandings" to Article 13(d).  First, the U.S. stated that the provision would apply only to "objects removed from the country of origin *after* the entry into force of this Convention for the states concerned." *Id.* at Declarations and Reservations, United States of America (emphasis added). Article 13(d) *Id.* at art. XIII(d).  Second, the U.S. stated that the "facilitate recovery of property" obligation refers to judicial actions in the "requested state" and that "such actions are controlled by the law of the requested State, the requesting State having to submit necessary proofs." *Id.*

Clearly, the U.S. was reserving to itself the right to determine whether particular items sought by foreign countries should be repatriated, and that the foreign country would have to provide "proofs" in order to obtain relief from U.S.

---

[4] Article 1(e) of the Convention includes "antiquities more than one hundred years old, such as inscriptions, coins" in the definition of "cultural property." The 1970 Convention, *supra* note 2, art. I. However, the CPIA states "no object may be . . . an object of archaeological interest unless such object . . . is at least two hundred and fifty years old." 19 U.S.C. §2601(2)(C)(i)(II).

courts.  These limits and others, reflecting the need to balance the Convention's

requirements with America's traditional free-trade policies, form the core of the

CPIA.

### b. The "Find Spot" Requirement Was a Compromise Meant to Protect Parties Such as Amici's Members.

The CPIA was enacted 11 years after the Convention entered into force, and

with the purpose of reining in CBP, which by then was assuming *all* cultural

property to be *illegally exported* cultural property.

> "[T]he CPIA was perhaps finally enacted only because it was
> perceived as a restraint of sorts on certain customs officers. These
> officials had deemed all archaeological materials that a foreign
> country had claimed were stolen to be subject to seizure under the
> National Stolen Property Act."

Barbara T. Hoffmann, ART AND CULTURAL HERITAGE: LAW, POLICY

AND PRACTICE, 160 (2006). Congress laid out clear parameters for CBP, the

same parameters which govern *Amici* members' purchases of coins overseas, and

which should govern this Court in interpreting the CPIA.

Congress was unambiguous: "U.S. actions need not be coextensive with the

broadest declarations of ownership and historical or scientific value made by other

nations…. [T]hese other countries should have the benefit of knowing what

minimum showing is required to obtain the full range of U.S. cooperation

authorized by this bill." S. Rep. 97-564, 25, 1982 WL 25142, JA 1081. The

question of unprovenanced coins was specifically addressed in a hearing before the

11

Subcommittee on Trade of the Committee on Ways and Means. "Cultural Property

Treaty Legislation," *Hearing before the House Subcommittee on Trade of the*

*Committee on Ways and Means, 96th Cong., 1st session on HR 3403* (1979) at 8,

JA 1095  The Department of State's Deputy Legal Adviser, Mark B. Feldman,

stated:

> [Coins] may well come within the definition but we did not have coins
> in mind when we addressed this issue. I think as a practical matter, it
> would not be a serious problem. In most cases, it is impossible to
> establish the provenance of a particular coin or hoard of coins.
> Therefore, there would be no reason for the United States, in most
> cases, to list coins as one of the categories of objects of archaeological
> or ethnological interest that would be included in the agreement.

*Id.* This was simply stating the obvious:  because it is impossible to establish

provenance of coins, coins would not fit within the CPIA definitional framework

and there would be no purpose to including coins in the bilateral agreements by

which foreign countries request return of archeological objects under CPIA.

The CPIA is a very limited statute, intended only to prevent modern-day

archaeological discoveries from entering the U.S. after having evaded the efforts of

domestic export authorities.  As the Department of State told the U.S. Senate:

> The governments which have been victimized have been disturbed at
> the outflow of these objects to foreign lands, and the appearance in the
> United States of objects has often given rise to outcries and urgent
> requires for return by other countries. The United States considers that
> on grounds of principle, good foreign relations, and concern for the
> preservation of the cultural heritage of mankind, it should render
> assistance in these situations.

S. Rep. 97-564, 22, 1982 WL 25142, at 3, JA 1078.  The focus in the CPIA is the *return* of items which evaded the requesting country's export regulations, which logically requires someone to have previously established that predicate fact.  See Part IV, *infra*.

### c.  Congress's Most Recent Enactment Relating to Syrian Artifacts Puts the Burden of Proof on the Government, Not the Importer

In May 2016, Congress enacted the Protect and Preserve International Cultural Property Act, P.L. No. 114-151, which directed the President to impose restrictions on importation of any "archeological or ethnological material of Syria", notwithstanding the fact that Syria's government did not request any restrictions under the CPIA regime.  In that statute, and the subsequent regulations, the term "archeological or ethnological material of Syria" was defined as "cultural property (as defined in section 302 of the Convention on Cultural Property Implementation Act (19 U.S.C. 2601)) that is unlawfully removed from Syria on or after March 15, 2011."  Congress does not authorize the seizure of Syrian artifacts generally, but only those "unlawfully removed from Syria" after a certain date.

### IV – The Court should Reverse and Remand for Proper Application of the CPIA Burdens of Proof regarding CPIA "Find Spots".

The District Court found that a coin "designated" in either the Cyprus or China list, and with no documented "find spot", must be forfeited, without a trial.

13

The District Court took the burden of proof language in §2606, which by its terms applies only to situations where the importer rebuts the Government's prima facie showing as to unlawful export from the requesting country, and interpreted it as *eliminating the need for such a prima facie showing* with respect to §2601. Section 2606 does not come into play, and the importer need make no showing at all, if the objects at issue are not covered by the CPIA in the first place because they have not been "first discovered within" and "subject to export control of", the country requesting them. Someone other than the importer must bear this initial burden.

The District Court held that the burden was met because "the material is listed by the Secretary (or delegate) on a designated list."[5] Section 2610 of the CPIA, entitled "Evidentiary Requirements", does require the U.S. Government to make such a showing with respect to any "archeological" items being claimed by a foreign country, but the District Court erred in holding that this was the Government's *only* burden now that forfeiture is at issue. Clearly, CBP agents may be expected in the first instance to follow the lists of items given to them, but nothing in the CPIA authorizes the forfeiture of transient items such as coins without any proof whatsoever that they were "found" in modern times in the

---

[5]  Citing *United States v. An Original Manuscript Dated November 19, 1778*, No. 96 civ. 6221 (LAP), 1999 WL 97894, (S.D.N.Y. Feb. 22, 1999) (the government must "show 'probable cause' to believe the property is subject to forfeiture"), the District Court looked to 19 U.S.C. §2610(1), "that the material has been listed by the Secretary in accordance with section 2604 of this title." *ACCG v. CBP, supra*, 801 F.Supp.2d at 400.

requesting country and exported from that country unlawfully after the CPIA

restrictions took effect. Some coins of the types listed in the Cyprus or China

agreements may fall within the CPIA's "first discovered within, and subject to

export control by" category. However, and notwithstanding anything the

requesting country or the U.S. Government might believe, *all Cyprus or China*

*coins were not found in those countries in modern times, and all such coins were*

*not unlawfully exported after the U.S. Government imposed restrictions*.

A lack of evidence concerning the provenance of particular coins tips the

balance in favor of the Government – and justifies granting summary judgment

ordered forfeiture – only where a pro-Government presumption is applied.  But

there is no pro-Government presumption in the CPIA framework.  By definition

the lists of "designated" coins are not prepared on a coin-by-coin basis, and each

coin entering the U.S. will have its own history dating back to ancient times.[6]  The

District Court denied Appellants a trial on the merits despite hearing evidence that

(a) coins shipped lawfully from one EU country (the UK) were probably not

previously exported unlawfully from another (Cyprus); and (b) coins shipped from

the U.K. in April 2009 probably weren't exported unlawfully from China after

---

[6] 19 U.S.C. §2604, "The Secretary may list such material by type or other appropriate
classification, but each listing made under this section shall be sufficiently specific and precise to
insure that (1) the import restrictions . . . are applied only to the archeological and ethnological
material covered by the agreement or emergency action." "Archaeological and ethnological
material" and "agreement" are both terms defined in 19 U.S.C. §2601, again using the "Find
Spot" language.

January 16, 2009, when the China restrictions took effect.[7]  The District Court's reasoning was that those proffered proofs did not create an issue of fact relating to the Government's entitlement to forfeiture because they were of a general nature, *i.e.,* they did not constitute evidence of when these particular coins left Cyprus and China.  The Government's lists of "designated" coins are likewise general in nature.  At the very least, Appellants were entitled to a trial, with a preponderance of the evidence standard, as to whether the coins they imported to the U.S. fell within the scope of CPIA.

Moreover, the District Court's grant of summary judgment to the Government – and its denial of summary judgment to Appellants – is  wholly at odds with the U.S. ratification "understanding" regarding Article 13(d) of the Convention, which states that in order to recover items being imported into the U.S. "the Requesting State [has] to submit necessary proofs".  Such "proofs" could not have consisted merely of unspecified lists of items that the requesting country itself prepares.  Rather, it must relate to some item-specific evidence, sufficient to carry the initial burden of establishing that the particular items at issue were found and unlawfully exported from the requesting country in modern times.  It is also contrary to CPIA §2604, which requires that any lists of items give "fair notice …

---

[7] Presumably, had Appellants imported the coins in question the same day the China restrictions took effect, the District Court might have entertained the possibility that they left China before that date.  Granting summary judgment with a three-month time "window" for the coins to have left China provides no assistance to dealers trying to predict whether their coins will be forfeited upon entry to the U.S.

to importers and other persons as to what material is subject to such restrictions". Short of prohibiting importation of any Chinese or Cypriot coin, Amici's members do not have fair notice of which items U.S. Customs will seize, because the definitions and burdens of proof in the CPIA are not being observed.

### Conclusion

The CPIA was not intended to create presumptive restrictions against importers, but rather to limit restrictions of any kind unless a foreign country met at least an initial burden of establishing that the items in question were covered by the CPIA and recoverable thereunder.  Without certainty that the CPIA will be interpreted in such a manner, American coin dealers cannot do business overseas, and American dealers and collectors cannot purchase coins from foreign sources.

In this case, the record contains no evidence that the coins being imported by ACCG were "first discovered in" and "subject to export control by" either China or Cyprus.  In accordance with the CPIA's clear words and Congress' equally clear intent, the coins should not be forfeited, and this Court should remand to the District Court for either a grant of summary judgment in Appellants' favor or, at a minimum, a trial on the merits.

Dated: July 6, 2017

Respectfully submitted,

__/Armen R. Vartian/_____
Armen R. Vartian

Attorney for Professional Numismatists Guild, Inc.
1601 N.Sepulveda Blvd. #581
Manhattan Beach, CA 90266
(310) 372-1355 phone
(866) 427-3820 fax
armen@vartianlaw.com

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 4,683 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2011* in *14pt Times New Roman*

Dated: July 6, 2017

__/Armen R. Vartian/_____
Armen R. Vartian
*Counsel for Amicus Curiae*
*Professional Numismatists Guild, Inc.*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 6th day of July, 2017, I caused this Brief of
Amici Curiae Professional Numismatists Guild, American Numismatic
Association, and International Association of Professional Numismatists to be filed
by hard copy delivery to the Clerk of the Court, to be followed by electronic filing
using the CM/ECF System.

I further certify that on this 6th day of July, 2017, I caused the required
number of bound copies of the Brief to be served on the parties in this action by
their counsel of record below via Overnight Delivery:

Peter K. Tompa
BAILEY & EHRENBERG, PLLC
1015 18th Street, NW, Suite 204
Washington, DC 20036
(202) 331-1331
*Counsel for Appellant*

Molissa H. Farber
OFFICE OF THE U.S. ATTORNEY
36 South Charles Street
Baltimore, Maryland 21201
(410) 209-4862
*Counsel for Appellees*

_____/Armen R. Vartian_____
Armen R. Vartian
*Counsel for Amicus Curiae*
*Professional Numismatists Guild, Inc.*